## CONNECTICUT RY. & LIGHTING CO. v. PALMER.

## In re NEW YORK, N. H. & H. R. CO. No. 201.

Circuit Court of Appeals, Second Circuit.
Feb. 13, 1940.

Emmet, Marvin & Martin, of New York City (George W. Martin, of New York City, of counsel), for appellant.

Hermon J. Wells, of New Haven, Conn., and James Garfield, of Boston, Mass., for appellees.

Robert G. Dodge and Talcott M. Banks, Jr., both of Boston, Mass., amici curiae.

Before SWAN, CLARK, and PATTERSON, Circuit Judges.

PATTERSON, Circuit Judge.

The claim is for damages on rejection of a lease by a railroad in course of reorganization under section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The claim has already been considered by this court and by the Supreme Court, and is here again after a second trial in the district court.

The claimant leased a street railway system to the New Haven for a 999 year term beginning in 1906. The agreed rent was $1,049,563.50 a year, and the New Haven was also to pay taxes on the lessor's income from the property. In October 1935, the New Haven filed petition for reorganization under section 77, and trustees were appointed. On December 18, 1935 the New Haven trustees rejected the lease as unprofitable. The claimant filed claim for damages caused by the rejection. The district court allowed the claim to the extent of damages accrued to the date of hearing in June 1937, some $1,260,000, and gave leave to prove damages accruing to the time of a later hearing. On appeal this court held that the claimant should also have been given an allowance on the tax covenant; in other respects the award was affirmed. The claimant took the case to the Supreme Court, on the point that the lower courts had erred in limiting the claimant to damages accrued at the time of a hearing. The Supreme Court sustained the claimant's position. Connecticut Railway & Lighting Co. v. Palmer, 305 U.S. 493, 59

S.Ct. 316, 83 L.Ed. 309. The measure of damages on rejection of a lease by a debtor under section 77, it was held, was the one generally applied by courts on repudiation of lease by a lessee—agreed rent for the balance of the term less rental value for the same period, both sums discounted to present worth. This measure of course includes prospective damages. The court went on to say that only such damages as might be proved to reasonable certainty were allowable, and that the difficulties in the way of proof were appreciated. Mention was made of the factors that uncertainty grew greater as the term lengthened, that it was harder to fix rental value of a street railway than rental value of a store, and that rejection of lease at a time of subnormal business conditions introduced further difficulties. The case was sent back for further proceedings.

On second trial in the district court in March 1939, the claimant sought to prove damages for the first 40 years after rejection of the lease. It conceded that for the 900 odd years beyond 1975 the damages were too vague to be estimated. As to the 40 years the claimant offered tabulations to show damages for each year to 1975. The present value of the agreed rent to 1975, at $1,049,563.50 a year discounted at four percent, came to about $20,000,000. The rental value was made up of interest from sinking fund, payments to sinking fund and operating income from the property. Only the last item presented difficulties. The operating income for 1936, 1937 and 1938, the first three years after rejection of the lease, was known; the results for those years, on the difference between agreed rent and rental value, showed damages of $1,838,485.35 already accrued at the time of the trial. For estimate of operating income beyond 1938 the claimant relied on past history of operating income and offered alternative bases, differing in the number of past years taken as experience for averaging income. One basis was the average annual operating income from July 1937 to December 1938, inclusive; this period, while covering only 18 months, was offered as a measure because it was the period of 100 percent bus operation, the present method of carrying passengers. A second basis was the average over 1936-1938, three years, that being the period of separate operation of the property. A third basis was the average over 1929-1938, an experience of ten years. A fourth basis took the average of 14 years, 1925-1938. On the alternative bases the present rental value for the 40 years ranged from $7,000,000 to $11,000,000. The claim for damages, the difference between present worth of agreed rent and present worth of rental value for 40 years, thus varied from $13,000,000 to $9,000,000, according to the experience taken in estimating annual income beyond 1938.

The district judge rejected all the past experiences tendered by the claimant as measures for estimating future earnings, —the 18 months because the time covered was one of subnormal business activity, the three years because of the same factor and also because a substantial part of the operation for half of the period was by trolley, the ten years and the 14 years because they included years when a large part of the operation was by trolley and also because it was thought that the frequency of good times and hard times reflected by these periods might not be duplicated in the future. The judge held further that even if the claimant proved enough to support an assessment of damages for part of the unexpired term, its inability to prove what the damages would be over the entire 969 years was fatal to the claim. He thought that the Supreme Court had laid stress on a high standard of proof, that no one could say what loss, if any, the lessor would sustain over the whole term of 969 years, and that he could not treat the lease as one for any shorter period. He therefore felt impelled to dismiss the claim, both as to damages accrued at the time of the hearing and as to damages estimated to accrue in future years. The only item allowed was a small one of $29,037.41 for income taxes accrued in 1936-1938 inclusive; this was allowed because it was provided for in the order entered on mandate from this court after the earlier appeal, an order which was viewed as a binding adjudication.

█ It goes without saying that damages for 969 years cannot be imagined, much less proved. The remainder of the lease covers a span longer than from the battle of Hastings to the present day. To try to forecast events for even a tenth of that futurity would appall the boldest prophet. It does not follow that the claimant should get no damages. For purposes of the age in which we live, we know that rejection of the lease caused a severe loss to the claimant. The lease was ruinous

to the New Haven from the outset, and highly advantageous to the claimant. Year after year the agreed rent was greater than earnings of the leased property, greater by a wide margin. When the New Haven went into reorganization the trustees lost no time in disclaiming the lease as unprofitable. Since then the judgment of the trustees in disclaiming has been vindicated; earnings in the three years between disclaimer and trial have been less than half the agreed rent. With such a history we are reasonably sure that the agreed rent will continue for some years to exceed the earnings of the property. Beyond those years the outlook is too uncertain. There is presently no cause to believe that earnings will be better in the distant years; for all that is known, the existing condition will continue indefinitely. The burden of proof, however, is on the claimant, and the uncertainties in the way of appraising earnings in the more distant years are too great. While the measure of a lessor's damages on rejection of lease is the agreed rent for the balance of the term less rental value for the same period, with both amounts discounted to present worth, a lessor may recover only so much of his damages as he is able to establish with reasonable certainty. In effect, the law for purposes of damages treats a lease with 969 more years to run as if it were only for a term within the reach of fairly definite forecast; the unpredictable stretch beyond is disregarded. See Old Colony R. Co. v. New York, New Haven & Hartford R. Co., 2 Cir., 98 F.2d 670, 672. In cases where recovery of prospective damages on breach of contract is demanded, the plaintiff is not called on to prove to a dead certainty that he will suffer a loss from the defendant's wrong. Reasonable expectation of loss is all that can generally be proved. Williston on Contracts (Rev.Ed.), section 1346. See also Hetzel v. Baltimore & Ohio R. Co., 169 U.S. 26, 38, 18 S.Ct. 255, 42 L.Ed. 648. Similarly, it does not matter that the total extent or precise amount of the harm done is not susceptible of proof. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 4 N.E. 264, 54 Am.Rep. 676. "The law will make the best appraisal that it can, summoning to its service whatever aids it can command." Sinclair Refining Co. v. Jenkins Petroleum Co., 289 U.S. 689, 697, 53 S.Ct. 736, 739, 77 L.Ed. 1449, 88 A.L.R. 496. It was error to hold that the inability of the claimant to prove damages over the entire 969 years sufficed to defeat the claim.

It follows that the district judge should have allowed at least the damages accrued prior to trial. To that extent there was no element of speculation or uncertainty. See Greenberg v. Paramount Publix Corporation, 2 Cir., 85 F.2d 42, 45, 106 A.L.R. 1116. As to damages to accrue in the future, we think that the judge was unduly critical of the evidence offered by the claimant. The claimant showed what the past earnings of the system had been, and evidence of past earnings in an established business is recognized as a substantial basis for estimating future earnings. Anvil Mining Co. v. Humble, 153 U.S. 540, 14 S.Ct. 876, 38 L.Ed. 814; Eastman Kodak Co. v. Southern Photo Materials Co., supra; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Williston on Contracts (Rev.Ed.) section 1346A. Of the periods of past earnings tendered by the claimant, that covering the 14 years prior to the time of the trial furnished a more reliable indication of future earnings than any of the others. It had the great merit of covering ups as well as downs in general economic conditions, which the shorter periods did not do. True, it included some years when a large part of the system was operated by trolleys. But the business in general character was the same as now, the carriage of passengers in cities and on relatively short runs; and we may take it, in the absence of evidence the other way, that the operating officers understood their business and were using the most efficient and economical means of carrying passengers at the various times within the period, changing from trolley to bus only as conditions warranted. So the average annual earnings for the 14 year period preceding the trial were enough to serve as an approximate measure of earnings for some years to come. For how many years? Any selection may seem somewhat arbitrary; whatever the number of years taken, a critic may ask why one year less or one year more was not taken. Obviously the predictable period varies in particular cases according to the stability of the business and other elements. In the present case the evidence suffices for exercise of an informed and reasoned judgment on the probable earnings in the

future. Having in mind the character of the property, the territory served, the history of operations down to the time of the trial, the general economic conditions under which past operations have been conducted, and the other factors in the case, we conclude that performance of the property for eight years beyond 1938 was predictable with a fair degree of certainty. This will allow the claimant damages for eleven years subsequent to rejection of the lease, the three years prior to trial for which damages are known and eight more years for which damages are estimated according to past experience for 14 years. The difference between agreed rent and rental value on this basis, discounted to present worth at the time of rejection, amounts to $4,411,837.61. The claim for damages on rejection of lease should have been allowed in that amount.

The court below thought that the Supreme Court on the former appeal had emphasized a high requirement of proof. As we see it, the Supreme Court did no more than lay down the standard usual in considering prospective damages, the rule of reasonable certainty. See Restatement of Contracts, section 331. We read the opinion as a caution against an award of · damages on anything like a 969 year basis.

■■■■ It remains to consider the damages for breach of the income tax covenant. The order entered on mandate from this court after the first appeal was not a binding determination of the claimant's rights. The matter of damages on rejection of the lease was then pending before the Supreme Court, and the claim for breach of the tax covenant after rejection was part of the asserted damages. The claimant was not obliged to take another appeal from the formal order on mandate in order to save its rights. The measure of damages for breach of the covenant is the aggregate of income taxes payable by the claimant on its earnings over a period equivalent to the remainder of the lease, these amounts to be discounted to present worth. Williston on Contracts (Rev.Ed.) section 1413. Here again, however, the requirement of reasonable certainty in determining damages cuts across the measure otherwise allowable. In respect to the tax liability which accrued against the claimant on its income for the years 1936, 1937 and 1938, the amount was liquidated at the time of trial. It was proper for the district court to allow

$29,037.41 for the taxes in those years. As to taxes for years in the future, there were uncertainties too serious to permit an assessment of damages. The earnings of the property could have been estimated, as we have said above, for eight more years with approximate accuracy. But the rate of tax for the future was a factor which the district court could not take for granted. Moreover, the experience over the three years prior to trial made it plain that the claimant's income tax liability was not a mere matter of taking the tax percentage of operating income. In 1937, for example, there was operating income of $179,000, but no income tax. We conclude, therefore, that the claimant has no grievance over the disallowance of the claim for income taxes beyond the amount of $29,037.41.

The order appealed from will be reversed, with direction to allow the claim in the amount of $4,411,837.61, in addition to the $29.037.41 already allowed.

Reversed.